**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF IOWA
CEDAR RAPIDS DIVISION**

LARENZO IRVIN,

        Plaintiff,

vs.

TYLER RICHARDSON, *in his individual
and official capacities*; et. al.,

        Defendants.

No. 17-cv-150-CJW-MAR

**ORDER**

_____

**TABLE OF CONTENTS**

I.     BACKGROUND ............................................................................ 2

II.    SUMMARY JUDGMENT STANDARD ................................................. 8

III.   DISCUSSION .............................................................................. 10

     A.    Federal Claims............................................................................ 10

          1.    Reasonable Suspicion ..................................................... 14

          2.    Terry Stop Versus Arrest.................................................. 20

          3.    Whether Plaintiff was Interrogated or Compelled to Waive His
               Right to Remain Silent ..................................................... 26

          4.    Liability of Chief Jerman and the City of Cedar Rapids ............ 27

     B.    State Law Claims.......................................................................... 30

      1.     Negligence ............................................................... 30

      2.     False Arrest ............................................................. 31

IV.   CONCLUSION ................................................................ 34

This matter is before the Court on defendants' Motion for Summary Judgment. (Doc. 40). Plaintiff timely filed his resistance (Docs. 46-49), and defendants timely filed a reply. (Doc. 54). In response to defendants' motion for summary judgment, plaintiff moved to voluntarily dismiss claims against defendants Heidi Northland and Michael Kern and to dismiss claims against defendants Tyler Richardson and Jared Jupin in their official capacities. (Doc. 55). That motion is **granted**. For the following reasons, defendants' motion for summary judgment is **granted** as to the defendants who are not dismissed by this Order, and **denied as moot** as to the defendants who are dismissed by this Order.

## I.    BACKGROUND

On April 24, 2016, at approximately 3:21 P.M., Cedar Rapids, Iowa police officers responded to a 911 report of a disturbance. The dispatcher informed the officers that "a disturbance with a weapon" occurred and referred the officers to "Higley Avenue and Wellington Street."[1] (Doc. 47, at 1-2; *see also* Doc. 40-2, at 3). The dispatcher

---

[1] The Court does not have either a recording of the call for service or an official transcript of the call. Plaintiff, however, transcribed the call and set forth that transcription in his pleadings. (*See* Doc. 47, at 2). The call for service report, which the Court does have, provides information similar to the information set forth in plaintiff's transcription. (*See* Doc. 47-1, at 4). The Court may properly refer to plaintiff's—the non-movant's—transcription in ascertaining the facts for purposes of summary judgment because in doing so, the Court is accepting plaintiff's transcription. This is consistent with the Court's obligation to resolve all factual ambiguities in the non-movant's favor.

further informed officers that "three black males" were involved in the disturbance, one of whom was reported to have displayed a gun. (Doc. 40-2, at 3; Doc. 47, at 2). The dispatcher informed officers that the man who allegedly displayed a gun wore a white t-shirt and was "heavier set," and that a second male was "in all blue." (Doc. 47, at 2). The dispatcher did not provide a description of the third male. Finally, the dispatcher informed officers that the citizen who had called 911 reported that the three males involved in the disturbance "live[d] at the corner house by the alley," but were "outside arguing."[2] (*Id.*; *see also* Doc. 47-1, at 4).

Dashcam footage from Officer Tyler Richardson's squad car shows that as he neared the corner of Higley Avenue and Wellington Street, he stopped to speak with a woman who flagged him down. The woman told Officer Richardson that one of the males involved in the alleged gun disturbance went around the corner—presumably the corner at Higley Avenue and Wellington Street—and was wearing either white and black clothing or white and blue clothing. Officer Richardson then continued driving along Higley Avenue and turned right onto Wellington Street. As Officer Richardson turned onto Wellington Street, two black males walking along the left side of Wellington Street came into view. The video shows one male—later identified as Derrick Bates—wearing a red shirt and dark pants and shows the other male—later identified as plaintiff—wearing dark clothing. At the time of the encounter, plaintiff was sixteen years of age. (*See* Doc. 47-1, at 11).

Officer Richardson stopped his vehicle, got out, and called out "Stop! Stop!" The males turned their heads in response to Officer Richardson, but kept walking. Officer Richardson then yelled "You, you guys!" The two males then initially stopped and turned

---

[2] Plaintiff suggests the dispatcher stated that the subjects of the 911 call were "present in the corner house where [they] were alleged to live." (Doc. 47, at 2). The Court finds no indication that the dispatcher informed officers that the males were physically present in the house. Rather, the dispatcher merely referenced the house as the males' alleged dwelling.

toward Officer Richardson, at which point the video shows that Bates' pants had a white stripe down the side and that plaintiff's shirt had a white stripe down the right arm. After initially stopping, however, the two males turned away from Officer Richardson and continued walking in the same direction toward an intersection. Plaintiff and Bates began turning left at the intersection down the next street. A fence and a tree began to partially block plaintiff and Bates from Officer Richardson's view as the pair turned left at the intersection.

Once plaintiff and Bates began walking away from Officer Richardson after having stopped, Officer Richardson began unholstering his gun and continued shouting commands for plaintiff and Bates to get on the ground. As Officer Richardson was doing so, Officer Jared Jupin's squad car, which had approached the scene from the opposite direction, came into view of Officer Richardson's dashcam. By the time Officer Jupin got out of his car, Officer Richardson had unholstered his gun and had it in hand, all the while walking toward plaintiff and Bates, who were still walking away from the officers despite Officer Richardson's commands to stop. Officer Jupin unholstered his weapon as well, and the two officers began closing in on plaintiff and Bates.

Plaintiff and Bates turned left at the intersection and disappeared from the view of Officer Richardson's dashcam. Officer Jupin's squad car, however, was positioned such that his dashcam captured the events that transpired following Officer Jupin's arrival on the scene.

The following facts are taken from the recording of events that were captured by Officer Jupin's dashcam. Officer Jupin left his car and began walking in front of his car, within the camera frame. As Officer Jupin did so, Officer Richardson repeatedly yelled "Get on the ground! Get on the ground now!" Plaintiff and Bates, although no longer walking, did not immediately get on the ground. Eventually, the two males kneeled on the ground and once they were kneeling, a male voice shouted "Face down!," "Get on

the ground now!," "Face down right now!," and "All the way down!" Plaintiff and Bates did not immediately get on the ground, and the commands for plaintiff and Bates to lay "Face down!" and to "Get on the ground now!" were repeated until plaintiff and Bates finally laid on the ground face down.

Once plaintiff and Bates were lying on the ground, Officer Richardson began handcuffing plaintiff while Jupin kept his gun trained on Bates, who was shouting at the officers. Plaintiff remained quiet throughout the encounter. Officer Jupin then handcuffed Bates. Just before starting to handcuff plaintiff and Bates, Officers Richardson and Jupin, respectively, each reholstered their firearms. The firearms then remained holstered throughout the duration of the encounter.

Once both males were handcuffed, Officer Richardson ran back to his squad car and drove down the street in pursuit of a black male wearing a white shirt that Officer Richardson had spotted walking down the street a block or so away. Officer Richardson stopped his car, got out, and called to the male to stop. The male stopped. Officer Richardson instructed the male to put his hands on a stone wall next to the sidewalk. The male complied. Officer Richardson then approached the male and performed a pat down search. Finding no weapon, Officer Richardson told the male he could stand up and turn around. Officer Richardson then spoke with the male to determine whether he was involved in the disturbance with the firearm. In his interactions with the male in the white shirt, Officer Richardson did not draw his firearm or handcuff the male.

Meanwhile, Officer Jupin, remained alone with plaintiff and Bates. Plaintiff continued to remain quiet and made only minor movements. Bates, even with his hands cuffed behind his back, shouted and moved about almost the entire time Officer Jupin was alone with the males. At some point, Officers Heidi Northland and Michael Kern arrived at the scene where Officer Jupin was supervising plaintiff and Bates. Eventually,

the officers assisted plaintiff in moving into seated (and eventually a standing) position so that plaintiff would not fall by attempting to do so himself without full use of his arms.

Officer Jupin began interviewing a witness. At approximately 3:35 P.M., the witness informed Officer Jupin that plaintiff and Bates were not involved in the alleged gun disturbance that was the subject of the 911 call. The interview concluded at 3:37:42 P.M. Within one minute, officers unhandcuffed the males.[3] Once officers uncuffed them, plaintiff and Bates wandered freely in the immediate vicinity, remaining within the camera's view. An officer told the males "You're free to go." Both plaintiff and Bates chose to remain at the scene and continued to move freely and converse with each other, a third bystander, and the officers.

As measured from the point at which the process of handcuffing began through the point at which the process of unhandcuffing began, plaintiff spent a total of 11 minutes and 32 second in handcuffs, and Bates spent a total of 11 minutes and 51 seconds in handcuffs. Plaintiff began the process of getting on the ground 18 seconds before he was handcuffed, and Bates began taking the same action 29 seconds before he was handcuffed. As such, the total time from when plaintiff began the process of getting on the ground through the point at which the handcuffs were removed was 11 minutes and 50 seconds. For Bates, the total time from beginning the process of getting on the ground through the point at which the handcuffs were removed was 12 minutes and 20 seconds.

Plaintiff filed a personnel complaint with the Cedar Rapids Police Department alleging that he "was restrained as a juvenile without probable cause." (Doc. 47-1, at 13). Bates, similarly, filed a personnel complaint regarding the April 24, 2016 incident.

---

[3] Plaintiff was unhandcuffed beginning at 3:38:24 P.M. Officers began removing Bates' handcuffs at 3:38:54 P.M.

(Doc. 40-3, at 29-31). Captain Craig Furnish,[4] as head of the Professional Standards Unit, was tasked with investigating plaintiff's and Bates' complaints. (*Id.*, at 25-28). In connection with Bates' complaint, Captain Furnish interviewed Bates, two private citizens who witnessed at least part of the April 24, 2016 incident, and each of five Cedar Rapids Police Department personnel who were present for at least a portion of the incident. (*Id.*, at 25-26). Captain Furnish also viewed the dashcam footage of the incident. (*Id.*, at 26). In investigating plaintiff's complaint, Captain Furnish reviewed the investigation that he had conducted into Bates' complaint, and also interviewed plaintiff. (*Id.*, at 27). In taking these steps, Captain Furnish concluded that he "had already gathered all evidence concerning the incident forming the basis of [plaintiff's] complaint." (*Id.*).

Plaintiff subsequently brought a three-count complaint in this Court. (*See* Doc. 22). Count One, which was brought against all defendants, was brought under Title 42, United States Code, Section 1983, and alleges that defendants violated plaintiff's rights to be free from illegal searches and seizures, to remain silent, and "to due process and equal protection of the law, including the right to be free from arrest without probable cause or to be the subject of custodial interrogation without *Miranda*[-]styled warnings." (*Id.*, at 10-11). Count Two asserts a state law negligence claim, in relevant part, against Officers Richardson and Jupin, and against the City of Cedar Rapids on a *respondeat superior* theory. (*Id.*, at 12-13). Count Three asserts a false arrest common law claim, in relevant part, against Officers Richardson and Jupin, and against the City of Cedar Rapids on a *respondeat superior* theory. (*Id.*, at 13). Defendants now seek complete summary judgment, arguing that they are entitled to judgment as a matter of law on a

---

[4] Captain Furnish was recently promoted to the rank of Police Captain. (*See* Doc. 40-3, at 25). Prior to that time, and at the time Captain Furnish investigated the April 24, 2016 incident, he held the rank of Lieutenant. (*Id.*).

number of bases, including qualified immunity with respect to the federal claims, and statutory immunity as to the state law claims. (*See* Docs. 40; 40-1).

## II.    *SUMMARY JUDGMENT STANDARD*

Summary judgment is appropriate where "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). When asserting that a fact is undisputed or is genuinely disputed, a party must support the assertion by "citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations . . ., admissions, interrogatory answers, or other materials." FED. R. CIV. P. 56(c)(1)(A); *see Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). Alternatively, a party may "show[ ] that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact." FED. R. CIV. P. 56(c)(1)(B). More specifically, "[a] party may object that the material cited to support or dispute a fact cannot be presented in a form that would be admissible in evidence." FED. R. CIV. P. 56(c)(2).

A fact is "material" if it "might affect the outcome of the suit under the governing law . . . ." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986) (citation omitted). "An issue of material fact is genuine if it has a real basis in the record," *Hartnagel v. Norman*, 953 F.2d 394, 395 (8th Cir. 1992) (citation omitted), or "when a reasonable jury could return a verdict for the nonmoving party on the question," *Wood v. DaimlerChrysler Corp.*, 409 F.3d 984, 990 (8th Cir. 2005) (internal quotation marks and citation omitted). Evidence that presents only "some metaphysical doubt as to the material facts," *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986), or evidence that is "merely colorable" or "not significantly probative," *Anderson*, 477 U.S. at 249-50, does not make an issue of fact genuine. In sum, a genuine issue of material fact requires "sufficient evidence supporting the claimed factual dispute" that it

"require[s] a jury or judge to resolve the parties' differing versions of the truth at trial." *Id.* at 249 (citation and internal quotation marks omitted).

The party moving for summary judgment bears "the initial responsibility of informing the district court of the basis for its motion and identifying those portions of the record which show a lack of a genuine issue." *Hartnagel*, 953 F.2d at 395 (citation omitted). Once the moving party has met this burden, the nonmoving party must go beyond the pleadings and by depositions, affidavits, or other evidence designate specific facts showing that there is a genuine issue for trial. *See Mosley v. City of Northwoods, Mo.*, 415 F.3d 908, 910 (8th Cir. 2005).

In determining whether a genuine issue of material fact exists, courts must view the evidence in the light most favorable to the nonmoving party, giving that party the benefit of all reasonable inferences that can be drawn from the facts. *Tolan v. Cotton*, 572 U.S. 650, 651 (2014); *Matsushita*, 475 U.S. at 587-88 (citation omitted); *see also Reed v. City of St. Charles, Mo.*, 561 F.3d 788, 790 (8th Cir. 2009) (stating that in ruling on a motion for summary judgment, a court must view the facts "in a light most favorable to the non-moving party—as long as those facts are not so 'blatantly contradicted by the record . . . that no reasonable jury could believe' them" (alteration in original) (quoting *Scott v. Harris*, 550 U.S. 372, 380 (2007)). A court does "not weigh the evidence or attempt to determine the credibility of the witnesses." *Kammueller v. Loomis, Fargo & Co.*, 383 F.3d 779, 784 (8th Cir. 2004) (citation omitted). "Rather, the court's function is to determine whether a dispute about a material fact is genuine . . . ." *Quick v. Donaldson Co., Inc.*, 90 F.3d 1372, 1376-77 (8th Cir. 1996).

When a motion for summary judgment on a Section 1983 claim rests on the assertion of qualified immunity, summary judgment is appropriate only if the Court finds 1) there are no genuine issues of material fact that would counter the qualified immunity defense, and 2) summary judgment on the issue of qualified immunity is proper as a

matter of law. *Johnson v. Jones*, 515 U.S. 304, 313-14 (1995) (suggesting that, had the movant been entitled to summary judgment as a matter of law, summary judgment on the qualified immunity defense would have been proper in the absence of a genuine issue of material fact). Thus, it can be said that when the defense of qualified immunity is raised, the movant need not prove the absence of *any* material fact, but need only prove the absence of any material fact relating to *the defense of qualified immunity*. If a dispute exists as to any material fact not pertaining to qualified immunity, but there are no disputes of material fact on the qualified immunity issue, summary judgment on the qualified immunity issue will be proper if the movant is so entitled as a matter of law. In keeping with the traditional summary judgment standard, all inferences of fact must be drawn in favor of the non-moving party. *Irving v. Dormire*, 519 F.3d 441, 446 (8th Cir. 2008).

## III.   DISCUSSION

### A.   Federal Claims

Plaintiff asserts a number of claims under Title 42, United States Code, Section 1983, which recognizes violations of federal statutory or constitutional law "committed by a person acting under color of state law." *West v. Atkins*, 487 U.S. 42, 48 (1988) (citations omitted). "[G]enerally, a public employee acts under color of state law while acting in his official capacity or while exercising his responsibilities pursuant to state law." *Id.* at 50 (citations omitted). Section 1983 does not provide a means by which a plaintiff can seek redress for violations of state law. *See Baker v. McCollan*, 443 U.S. 137, 146 (1979).

"A municipality or other local government may be liable under [Section 1983] if the governmental body itself 'subjects' a person to a deprivation of rights or 'causes' a person 'to be subjected' to such deprivation." *Connick v. Thompson*, 563 U.S. 51, 60 (2011) (citing 42 U.S.C. 1983). "Plaintiffs who seek to impose liability on local

governments under [Section] 1983 must prove that action pursuant to official municipal policy caused their injury." *Id.* at 60-61 (citation and internal quotation marks omitted). Official policies can include "the acts of . . . policymaking officials . . . and practices so persistent and widespread as to practically have the force of law." *Id.* at 61. "These are actions for which the municipality is actually responsible." *Id.* (citation and internal quotation marks omitted). Further, if an authorized policymaker approves a subordinate's decision and the basis for that decision, the policymaker's "ratification would be chargeable to the municipality because [the policymaker's] decision is final." *City of St. Louis v. Praprotnik*, 485 U.S. 112, 127 (1988).

"In limited circumstances, a local government's decision not to train certain employees about their legal duty to avoid violating citizens' rights may rise to the level of an official government policy for purposes of [Section] 1983." *Connick*, 563 U.S. at 61. "To satisfy the statute, a municipality's failure to train its employees in a relevant respect must amount to deliberate indifference to the rights of persons with whom the [untrained employees] come into contact." *Id.* (citation and internal quotation marks omitted). Although municipalities are treated as natural persons "subject to suit for a wide range of tortious activity," they are not subject to punitive damages. *City of Newport v. Fact Concerts, Inc.*, 453 U.S. 247, 259-60 (1981).

Government officials are entitled to qualified immunity from suit under Section 1983 "insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982) (citations omitted). Whether to afford qualified immunity, therefore, consists of two separate prongs: "whether the facts a plaintiff has . . . shown make out a violation of a constitutional right," and "whether the right at issue was 'clearly established' at the time of defendant's alleged misconduct." *Pearson v. Callahan*, 555 U.S. 223, 232 (2009). In assessing whether a government official is

entitled to qualified immunity, the lower courts are vested with discretion in determining which prong to address first. *Id.* at 236.

Plaintiff asserts that the April 24, 2016 incident violated his rights 1) to be free from illegal searches and seizures; 2) to remain silent; and 3) to due process and equal protection of the law, including the rights to be free from arrest without probable cause or to be the subject of custodial interrogation without *Miranda*-styled warnings. (Doc. 22, at 10-11). Plaintiff argues that Officers Richardson and Jupin directly violated these rights. Plaintiff further asserts that the City of Cedar Rapids is liable to plaintiff because it adopted a policy, practice, custom, or procedure that led to the violations. Plaintiff also alleges that Police Chief Wayne Jerman is liable because he implemented the policy, practice, custom, or procedure. (*Id.*, at 9-10). Finally, plaintiff alleges that the City of Cedar Rapids, through its policymakers, including Chief Jerman, failed to train and/or supervise officers regarding lawful arrest procedures.

Plaintiff's federal claims stem from two essential allegations: plaintiff's detention and alleged arrest, and any dialogue that may have been exchanged between plaintiff and Officers Richardson and Jupin. The Court will first consider whether plaintiff's detention and alleged arrest were lawful under federal law. The Court recognizes that plaintiff attempts to draw a distinction between the treatment afforded to juvenile detainees and arrestees as compared with the treatment afforded to adult detainees and arrestees. (*See id.*, at 7-9). Plaintiff, relies, however, on Iowa state law in asserting that the officers did not comply with plaintiff's juvenile rights. (*See id.*). "Violations of state law do not state a claim under 42 U.S.C. § 1983. Section 1983 guards and vindicates federal rights alone." *Doe v. Gooden*, 214 F.3d 952, 955 (8th Cir. 2000) (citations omitted). Plaintiff's attempt to assert violations of state law by way of Section 1983 must, therefore, fail as a matter of law. Plaintiff does not cite to any federal legal basis for his claims regarding his status as a juvenile, and the Court is unaware of any federal right that would support

such claims.[5]  To the extent plaintiff asserts that Iowa law forms the basis for any claims under Section 1983, defendants' motion for summary judgment is **granted**.

Should the Court find that plaintiff's detention was lawful under federal law, Officers Richardson and Jupin will be entitled to qualified immunity as to plaintiff's claims of unlawful search and seizure.  *Pearson*, 555 U.S. at 232.  Further, if the detention was lawful, plaintiff will have no basis for asserting the existence of an official Cedar Rapids policy, practice, custom, or procedure that injured plaintiff.  That is, even if the City of Cedar Rapids and/or Chief Jerman promulgated an official policy, practice, custom, or procedure that *could* cause a plaintiff injury, if plaintiff was not injured as a result of such policy, practice, custom, or procedure, plaintiff would not have standing to pursue those claims.  *See City of Los Angeles v. Lyons*, 461 U.S. 95, 101-02 (1983) (discussing the requirement that a plaintiff have Article III standing to pursue any federal action, including cases brought under Section 1983).

The Fourth Amendment to the United States Constitution protects a person's right to be free from "unreasonable searches and seizures."  Defendants do not dispute that plaintiff was searched and seized, and the Court will therefore assume that plaintiff was searched and seized, for purposes of the current motion.  In the interest of crime prevention and detection, "a police officer may in appropriate circumstances and in an appropriate manner approach a person for purposes of investigating possibly criminal

---

[5] The Southern District of Texas, when confronted with a situation when officers handcuffed and detained two children—ages three years and five years—for approximately ten minutes, held that the detention was a lawful *Terry* stop and, further, stated as follows:

> Although Plaintiffs point to the Texas Family Code for the proper procedures for detaining children, any violations of the Texas Family Code are a matter of state law.  Any such violations that may have occurred do not rise to the level of a violation of the United States Constitution.  Therefore, these violations are not actionable under § 1983.

*Duggan v. City of League City, Tex.*, 975 F. Supp. 968, 969, 972 (S.D. Tex. 1997).

behavior even though there is no probable cause to make an arrest." *Terry v. Ohio*, 392 U.S. 1, 22 (1968).

The Eighth Circuit Court of Appeals has elaborated on the permissible scope of *Terry* stops:

> An investigatory, or *Terry*, stop without a warrant is valid only if police officers have a reasonable and articulable suspicion that criminal activity may be afoot. Officers must use the least intrusive means of detention and investigation, in terms of scope and duration, that are reasonably necessary to achieve the purpose of the *Terry* stop. A *Terry* stop may become an arrest, requiring probable cause, if the stop lasts for an unreasonably long time or if officers use unreasonable force. However, as part of a lawful *Terry* stop, officers may take any measures that are "reasonably necessary to protect their personal safety and to maintain the status quo during the course of the stop." *United States v. Hensley*, 469 U.S. 221, 235 (1985).

*United States v. Newell*, 596 F.3d 876, 879 (8th Cir. 2010) (internal citations and quotation marks omitted). "Police officers reasonably may handcuff a suspect during the course of a *Terry* stop to protect their personal safety." *United States v. Morgan*, 729 F.3d 1086, 1091 (8th Cir. 2013) (citations omitted). "In determining whether a detention is too long to be justified as a *Terry* stop, [the Court] consider[s] whether the officers 'diligently pursued a means of investigation that was likely to confirm or dispel their suspicions quickly.'" *Id.* at 1090 (citing *United States v. Sharpe*, 470 U.S. 675, 686 (1985)). "There is no bright line rule; instead, 'common sense and ordinary human experience must govern over rigid criteria.'" *Id.* (citing *Sharpe*, 470 U.S. at 685; *United States v. Place*, 462 U.S. 696, 709 (1983)).

### 1. *Reasonable Suspicion*

When Officer Richardson first encountered plaintiff and Bates, Officer Richardson only knew that he was being dispatched to investigate a "disturbance with a weapon," involving three black males, one of whom was supposedly clad in all blue, one of whom

was supposedly "heavier set" and wore a white t-shirt, and one of whom Officer Richardson had no description. As he approached the area to which he was dispatched, Officer Richardson encountered a woman who directed Officer Richardson to the location where he found plaintiff and Bates. The woman also provided a clothing description for one of the two males she referenced, which description somewhat matched the description Officer Richardson received from dispatch of one of the males. The parties do not suggest that there were any other males matching the suspects' descriptions in the area. Considering that plaintiff and Bates were found in the vicinity to which Officer Richardson was dispatched and directed, that plaintiff's clothing matched the description Officer Richardson had of one of the three males, and that Bates could have been the third male for whom no description was provided, the Court finds that Officer Richardson could reasonably believe that plaintiff and Bates were involved in the incident that Officer Richardson was dispatched to investigate.[6] *See United States v. Fisher*, 364 F.3d 970, 973 (8th Cir. 2004) (finding that officers had reasonable suspicion to conduct an investigative stop, in part, because the suspect "was in close proximity to the scene of the alleged [crime] at or around the time it was alleged to have occurred").

Officer Richardson's reasonable suspicion that plaintiff and Bates were two of the three males whom Officer Richardson sought was strengthened when Officer Richardson

---

[6] The Court finds the Eighth Circuit's decision in *United States v. Quinn* instructive:

> [Defendant's] attempts to undermine the factors that contributed to [the police officer's] reasonable suspicion fail when each factor is considered in light of the totality of the circumstances. Although [the officer] relied heavily on a relatively generic suspect description—one which [defendant] did not match perfectly—his reliance was justified due to the lack of other pedestrians within the perimeter. We have held that generic suspect descriptions and crime-scene proximity can warrant reasonable suspicion where there are few or no other potential suspects in the area who match the description.

812 F.3d 694, 698-99 (8th Cir. 2016) (footnote omitted).

saw a third male in a white shirt down the street from where Officer Richardson stopped plaintiff and Bates. This is so because upon seeing the third male, Officer Richardson was able to match the descriptions of plaintiff and the third male to the descriptions provided by dispatch, and Bates could have been the third male, for whom no description was provided. The Court therefore concludes that Officer Richardson's reasonable suspicion was enhanced when he saw the third male down the street from where plaintiff and Bates were stopped.

Plaintiff argues that Officer Richardson's initial inability to perceive whether plaintiff was black negates any reasonable suspicion that plaintiff was one of the suspect males. (*See* Doc. 49, at 19-20). The Court rejects this argument. Even if plaintiff's race was not immediately identifiable when Officer Richardson initiated the encounter, the remaining facts that Officer Richardson had were sufficient to create reasonable suspicion that plaintiff was one of the males Officer Richardson sought.

The Court is also persuaded that the officers could have reasonably believed that the males referenced by the dispatcher were involved in criminal activity. Defendants assert that the officers could have reasonably believed that either plaintiff or Bates was unlawfully using—or had unlawfully used—the gun that was referenced in the 911 call. (Doc. 54, at 7-8). The Court agrees. Specifically, the Court finds that the officers could have believed that either plaintiff or Bates was unlawfully in possession of a concealed firearm in violation of Iowa Code Section 724.4(1). As the Eighth Circuit recently held in *United States v. Pope*, and reiterated in *United States v. Sykes*, "an officer in Iowa may briefly detain someone whom the officer reasonably believes is possessing a concealed weapon." *Sykes*, 914 F.3d 615, 617 (8th Cir. 2019) (citing *Pope*, 910 F.3d 413, 416 (8th Cir. 2018)). "[S]ince a concealed-weapons permit is merely an affirmative defense to a charge under § 724.4(1), an officer may presume that the suspect is

committing a criminal offense until the suspect demonstrates otherwise." *Id.* (citing *Pope*, 910 F.3d at 415-16).

Here, similarly to *Sykes*, the caller identified herself to the 911 dispatcher and described the three males involved in a dispute in which a handgun was displayed. *See Sykes*, 914 F.3d at 617. Although the caller here did not describe the alleged gun possessor as definitively as did the informant in *Sykes*, the caller did narrow the allegation down to encompass only one of three males who were arguing outside. That the males were identified as arguing outside increased the possibility that other witnesses could corroborate the caller's identification of the three males who were allegedly involved in the dispute. The possibility for independent corroboration lends indicia of reliability to the caller's identification of the alleged gun possessor because a second, independent witness could come forward and dispute whether the three males identified by the caller were actually involved in the dispute. The added indicia of reliability provides support for the officers to reasonably believe that one of the males involved in the dispute had a gun.

The Court also finds that it would have been reasonable for Officer Richardson to suspect that the males were in possession of a concealed gun, as opposed to a gun openly carried. There is no indication that Officer Richardson could see that either plaintiff or Bates was in possession of a gun when Officer Richardson first encountered them. Indeed, Officer Richardson's affidavit, which details the rationale behind Officer Richardson approaching plaintiff and Bates, makes no mention of either male being in possession of a gun. (*See* Doc. 40-5, at 20-24). Had Officer Richardson seen that either male possessed a gun, Officer Richardson likely would have included this fact in his affidavit as support for Officer Richardson's decision to remove his own firearm from its holster and point the weapon at plaintiff and Bates. That the fact is absent from the affidavit indicates that if either plaintiff or Bates was in possession of a gun, the gun was

concealed. *See Sykes*, 914 F.3d at 618 ("We . . . believe it was reasonable to suspect that [defendant] or his companion had a concealed gun, as opposed to a gun openly carried, since the [informant] never reported that she actually saw a gun in [defendant's] or his companion's possession."). As explained above, the Eighth Circuit Court of Appeals has held that reasonable suspicion that an individual (or one of multiple individuals) is in possession of a concealed gun in Iowa permits an officer to briefly detain that person for investigatory purposes. *Id.* at 617.

Further, the Court finds that the officers reasonably could have believed that the male who allegedly "displayed" a gun during the dispute committed—or was committing—the criminal offense of assault. *See* IOWA CODE § 708.1(2). In Iowa, assault is defined, in relevant part, as "[a]ny act which is intended to place another in fear of immediate physical contact which will be painful [or] injurious . . . coupled with the apparent ability to execute the act," or a person "[i]ntentionally point[ing] any firearm toward another, or display[ing] in a threatening manner any dangerous weapon toward another." *Id.* § 708.1(2)(b)-(c). The call for service report indicates that officers were dispatched to investigate a "WEAPONS FIREARMS" incident that involved three males "OUTSIDE ARGUING," one of whom "DISPLAYED A HAND GUN." (Doc. 40-5, at 25). Although the mere report of an individual being in possession of a handgun may not be sufficient to create reasonable suspicion of criminal activity, the report of a firearm, here, was made in the context of the possessor arguing with two other males. *See Pope*, 910 F.3d at 414-16 (contemplating whether possession of a firearm, without more, is sufficient to create reasonable suspicion). In this context, the officers reasonably could have believed that the gun was being "displayed" to instill fear in either or both of the other two males involved in the dispute, or to threaten either or both of the other two males.

Finally, the Court notes that plaintiff and Bates did not stop immediately upon Officer Richardson's request, which serves to strengthen any reasonable suspicion Officer Richardson may have had that criminal activity was afoot. *United States v. Reed*, 733 F.2d 492, 504, 504 n.7 (8th Cir. 1984) (finding that probable cause for an arrest was supported, in part, by the defendants acting in a criminally suggestive manner by fleeing upon seeing a law enforcement officer). *See also Illinois v. Wardlaw*, 528 U.S. 119, 125-26 (2000) (permitting officers to conduct an investigatory stop of an individual who takes flight upon being approached by law enforcement and, further, stating that *Terry* permits officers to stop individuals for investigatory purposes even when those individuals are engaged in activities that are "susceptible of an innocent explanation"); *United States v. Stigler*, 574 F.3d 1008, 1010 (8th Cir. 2009) (finding that a suspect's conduct of walking away from officers added to reasonable suspicion to stop the suspect). Having found that Officer Richardson could reasonably believe that plaintiff and Bates were two of the males for whom Officer Richardson was searching, and that Officer Richardson could reasonably believe that one of them could have been in possession of a concealed gun in violation of Iowa law, the Court finds that Officer Richardson had reasonable suspicion that criminal activity was afoot, permitting him to effect a valid *Terry* stop. *See Sykes*, 914 F.3d at 617.

Likewise, the Court finds that Officer Jupin had reasonable suspicion to effect a *Terry* stop. When Officer Jupin arrived on the scene, he immediately faced a scenario in which his fellow officer had his weapon drawn and was closing in on two suspects who were refusing Officer Richardson's commands to get on the ground. This information, in combination with the call for service report indicating that Officer Jupin was to investigate a disturbance involving a gun, was sufficient for Officer Jupin to have a reasonable suspicion that criminal activity was afoot. *Reed*, 733 F.2d at 502. *See also*, *United States v. Benitez*, 328 F. App'x 823, 825 (3d Cir. 2009) (holding that where a

vehicle was in the process of being detained when the passenger exited the vehicle and fled, officers had reasonable suspicion that criminal activity was afoot). Additionally, as described above, plaintiff matched the description of one of the three males described in the call for service report, and Bates could have been the third male for whom no description was provided. Finally, Officer Jupin's reasonable suspicion that plaintiff and Bates were two of the three males involved with the firearm was enhanced upon seeing the third male down the street from where plaintiff and Bates were stopped in the same way it was for Officer Richardson. These facts, considered together, were sufficient to give Officer Jupin reasonable suspicion that criminal activity was afoot and that plaintiff and Bates were involved in that criminal activity. *Reed*, 733 F.2d at 502.

### 2. **Terry** *Stop Versus Arrest*

The next step in the Court's inquiry into whether Officers Richardson and Jupin violated clearly established law is to consider whether the stop became an arrest at any point.[7] "[A]n action tantamount to arrest has taken place if the officers' conduct is more intrusive than necessary for an investigative stop." *United States v. Raino*, 980 F.2d 1148, 1149 (8th Cir. 1992) (citation and quotation marks omitted). When conducting a *Terry* stop, "an officer may take such steps as are 'reasonably necessary to protect [his] personal safety and to maintain the status quo' so that the limited purposes of the stop may be achieved." *Id.* (alteration in original) (quoting *Hensley*, 469 U.S. at 235). Approaching a suspect with guns drawn does not "elevate[ ] an investigative stop into an arrest if the police action is reasonable under the circumstances." *Id.* (citation and

---

[7] Plaintiff's voluntary dismissal of Officers Northland and Kern suggests that plaintiff does not intend to maintain any claims based on conduct that occurred from the point at which either Officer Northland or Officer Kern, whoever arrived first, arrived at the scene. In the interest of resolving all claims that could conceivably be before the Court, however, the Court will consider whether the stop became an arrest at any point, including after Officers Northland and Kern arrived on the scene.

internal quotation marks omitted).  Further, "[i]t is well established . . . that when officers are presented with serious danger in the course of carrying out an investigative detention, they may brandish weapons or even constrain the suspect with handcuffs in order to control the scene and protect their safety." *Fisher*, 364 F.3d at 973 (citations omitted).

> Factors to consider in determining the reasonableness of the officers' actions include 1) the number of officers and police cars involved; 2) the nature of the crime and whether there is reason to believe the suspect might be armed; 3) the strength of the officers' articulable, objective suspicions; 4) the erratic behavior of or suspicious movements by the persons under observation; and 5) the need for immediate action by the officers and lack of opportunity for them to have made the stop in less threatening circumstances.

*Raino*, 980 F.2d. at 1149-50.

When Officer Richardson first attempted to engage plaintiff and Bates, he was the only officer present, and his squad car was the only police vehicle present.  Even after Officer Jupin arrived at the scene, there were still only two officers with two suspects. The small number of officers and police vehicles indicates that the stop was a reasonable stop and not an arrest.  Moreover, handcuffing plaintiff and Bates is consistent with a reasonable *Terry* stop when one considers that the officers were present in equal numbers as the suspects and, therefore, could not rely on the advantage of being more numerous if the situation escalated into violence.  The same holds true, to a greater degree, when considering whether it was reasonable for Officer Jupin to keep plaintiff and Bates handcuffed when Officer Jupin was alone with them.  Finally, by the time Officers Northland and Kern arrived, Officer Richardson had left the scene in his squad car to pursue a third suspect.  As a result, there were three officers present and either two or three police vehicles.  Even though the number of officers exceeded the number of suspects by one, there were not so many officers or vehicles present to convert the stop into an arrest.

As explained above, the officers had reason to believe that either plaintiff or Bates, or both, could have been armed, and plaintiff and Bates did not immediately comply with Officer Richardson's commands. Approaching the males with their guns raised was, therefore, reasonable to ensure the officers' safety. Further, when Officer Jupin arrived on the scene, he saw Officer Richardson, gun drawn, approaching plaintiff and Bates. Officer Jupin reasonably could have believed that the situation was dangerous and that Officer Jupin would be endangering his own life or safety, or Officer Richardson's, by not drawing his own weapon. Officer safety is important and the Court finds that Officer Jupin's actions were reasonable.

Likewise, even once plaintiff and Bates were patted down to check for weapons, the Court finds that it was reasonable for the officers to keep them handcuffed until the officers could be assured that they were not involved in the alleged gun disturbance. Officer Jupin was "mindful of the fact that if [plaintiff and Bates] had been involved in the gun disturbance . . ., either of them could have had a weapon which they discarded in order to avoid being found by police with the weapon." (Doc. 40-5, at 30). Plaintiff acknowledges that either he or Bates could have discarded a weapon prior to turning the corner where plaintiff and Bates were ultimately apprehended. (Doc. 47, at 10). Even if retrieving a potentially discarded weapon would have required plaintiff or Bates to move a slight distance, the danger that they could retrieve a weapon still existed. Although officers ultimately did not recover a gun and concluded that plaintiff and Bates were found to be uninvolved with the disturbance, the officers did not have this information until they finished their investigation. The officers were, therefore, justified in taking those steps reasonably necessary to ensure their own safety, including handcuffing plaintiff and Bates, to decrease the likelihood of either of them retrieving a discarded gun. The Court concludes that the second factor enumerated in *Raino* supports a finding that the encounter was a *Terry* stop, as opposed to an arrest.

Officer Richardson's and Jupin's reasonable, articulable suspicions have been discussed in detail, and the Court will not repeat that discussion here in addressing the objectivity of the officers' suspicions. The suspicions were strong enough to justify taking those measures that were reasonably necessary to permit the officers to investigate the alleged dispute. The Court finds that the officers did have reasonable suspicion that criminal activity was afoot and that the suspicion was based on objective, articulable facts. The Court is persuaded that this factor weighs in favor of finding that the stop was a *Terry* stop.

Turning to the fourth factor, the Court finds that plaintiff and Bates did not act in an "erratic" manner, *per se*, but neither did they exhibit a willingness to cooperate. Indeed, they initially did not cooperate, continuing to walk away from the officers and ignoring the officers' commands. The lack of immediate cooperation, coupled with information that the officers were investigating a dispute involving a gun, justified the officers drawing their own weapons prior to approaching plaintiff and Bates. Further, once handcuffed, Bates did not remain still and was visibly upset with the situation. These expressions of emotion showed that the situation could become volatile with relative ease. The potential for such volatility justified keeping both males handcuffed. Even though plaintiff was cooperative once handcuffed, Bates was not. Without personal knowledge of plaintiff, the officers could not be certain that plaintiff would not also become upset or attempt to liberate Bates. Thus, removing the handcuffs from plaintiff would have posed a greater risk to the officers' safety until such time as the officers could confirm that plaintiff and Bates did not have ready access to a gun. The Court therefore finds that this factor weighs in favor of finding that the stop was a valid *Terry* stop. This factor carries more than marginal weight but less than great weight because plaintiff and Bates were not acting "erratically," but were not overly cooperative either.

The fifth factor somewhat overlaps with the fourth factor here. As set forth above, the fifth factor considers "the need for immediate action by the officers and lack of opportunity for them to have made the stop in less threatening circumstances." *Raino*, 980 F.2d. at 1150. The Court has found that the lack of cooperation and potential for either plaintiff or Bates, or both, to be armed justified the officers' drawing their weapons prior to approaching the males. Similarly, to ensure the officers' own safety, the officers were justified in handcuffing the males until the officers could be assured that they posed no danger in connection with the alleged gun dispute. This was particularly true when Officer Jupin remained alone with the males.

That Officers Richardson and Jupin took only those actions reasonably necessary under the circumstances is highlighted by Officer Richardson's interaction with the other possible suspect, whom Officer Richardson encountered immediately after encountering plaintiff and Bates. There, when Officer Richardson told the male to stop, he did. When Officer Richardson told the male to place his hands on a retaining wall, he did. After Officer Richardson patted down the male and did not discover a firearm, he allowed the man to resume a normal position and engaged the male in conversation. Officer Richardson did not draw his weapon and did not handcuff the male. This male, like plaintiff and Bates, was black. Officer Richardson's interaction with plaintiff and Bates was different from his interaction with the single male because the pair refused to comply with Officer Richardson's commands, while the single male did.

The nature of weapons disputes frequently requires law enforcement officers to act quickly because the situation can change rapidly. The Court finds that, when plaintiff and Bates refused to comply with the officers' repeated commands, it was reasonable and appropriate for the officers to approach the males with their service weapons drawn and to secure the pair using handcuffs until the officers were able to verify that plaintiff and Bates were not involved in the alleged dispute. Had the officers declined to draw their

own weapons or utilize handcuffs, the officers could have been placing themselves in grave danger. *See Morgan*, 729 F.3d at 1091 (permitting officers to use handcuffs during the course of a *Terry* stop to maintain officer safety). The Court is thus persuaded that the officers did not err in their approach to the situation. This factor weighs heavily in favor of finding that the stop was a reasonable *Terry* stop because the officers were taking only those actions as were reasonably necessary to guarantee their own safety and to secure plaintiff and Bates.

The five factors, collectively, weigh heavily in favor of finding that the stop was a reasonable *Terry* stop, as opposed to an arrest. Additionally, the stop concluded as soon as reasonably practicable upon hearing from a witness that plaintiff and Bates were not involved in the alleged gun dispute. The officer interviewing the witness concluded the interview and immediately removed the handcuffs from plaintiff and Bates. The expediency with which the officers worked to release plaintiff and Bates shows that the officers attempted to make the stop as unintrusive as possible, while still permitting the officers to investigate the allegations and protect their own safety. Further, plaintiff and Bates were handcuffed for fewer than twelve minutes and only during the investigation into the alleged dispute. The entire time the males were handcuffed, the officers were attempting to uncover information about the report of a dispute involving a gun. The Court is therefore satisfied that the officers acted diligently to conduct their investigation, and that the males were detained no longer than was necessary for the officers to pursue their investigation. *See id.* at 1090.

Considering the relevant facts, the Court finds that the stop was a reasonable *Terry* stop and did not evolve into an arrest at any point. In light of the Court's conclusion that the stop was supported by reasonable suspicion that criminal activity was afoot, the Court finds that the *Terry* stop was legal and, thus, did not violate plaintiff's Fourth Amendment right to be free from unreasonable searches and seizures. Having found that the stop

itself was legal, the Court also concludes that neither Officer Richardson nor Officer Jupin violated any law in effecting the *Terry* stop, and the officers are therefore entitled to qualified immunity to the extent plaintiff's claims rest on the assertion that the stop itself was unlawful. *See Harlow*, 457 U.S. at 818. Defendants' motion for summary judgment is **granted** as to plaintiff's claims that Officers Richardson and Jupin violated his Fourth Amendment rights to be free from unreasonable searches and seizures.

### 3. Whether Plaintiff was Interrogated or Compelled to Waive His Right to Remain Silent

Plaintiff next asserts that the officers subjected him to an unlawful custodial interrogation without being *Mirandized*, violating his right to remain silent. (Doc. 22, at 10-11). Plaintiff asserts that he was entitled to these rights under the Fifth and Fourteenth Amendments to the United States Constitution. (*Id.*, at 11). Officers never filed charges against plaintiff. (*Id.*, at 6).

The United States Supreme Court has held that although the Fifth Amendment's privilege against self-incrimination may be asserted in non-criminal proceedings, "a violation of the constitutional *right* against self-incrimination occurs only if one has been compelled to be a witness against himself in a criminal case." *Chavez v. Martinez*, 538 U.S. 760, 770 (2003) (citations omitted, emphasis in original); *accord Hannon v. Sanner*, 441 F.3d 635, 637-38 (8th Cir. 2006). Similarly, the Supreme Court has held that an officer's failure to advise persons of their *Miranda* rights prior to conducting custodial interrogations cannot form the basis for claims under Section 1983. *Chavez*, 538 U.S. at 772-73; *Hannon*, 441 F.3d at 637-38. The Supreme Court explained that the *Miranda* exclusionary rule is a prophylactic rule intended "to prevent violations of the right protected by the text of the Self-Incrimination Clause," and violations of prophylactic rules that are designed to safeguard constitutional rights "do not violate the constitutional rights of any person." *Chavez*, 538 U.S. at 772. *Accord Hannon*, 441 F.3d at 637-38.

The Supreme Court has opined, and the Eighth Circuit Court of Appeals has held, that when an individual is not compelled to bear witness against himself in a criminal case, the individual's Fifth Amendment right against self-incrimination has not been violated. *Chavez*, 538 U.S. at 770; *Hannon*, 441 F.3d at 637-38. No charges were ever filed against plaintiff, and plaintiff was never compelled to be a witness against himself in a criminal case, with respect to plaintiff's current claims. Plaintiff did not, therefore, suffer a violation of his Fifth Amendment right against self-incrimination. Likewise, even assuming plaintiff was not *Mirandized*, and that the officers' failure to *Mirandize* plaintiff was improper, the officers' actions did not amount to a violation of plaintiff's rights. *Chavez*, 538 U.S. at 772; *Hannon*, 441 F.3d at 637-38.

The Court finds that Officers Richardson and Jupin did not violate any clearly established rights that plaintiff may have had and that the officers are thus entitled to qualified immunity on plaintiff's claims that he was subjected to an unlawful custodial interrogation without being *Mirandized*, and on plaintiff's claims that the officers violated his right to remain silent. *See Harlow*, 457 U.S. at 818. Defendants' motion for summary judgment is **granted** as to these claims against Officers Richardson and Jupin.

### 4. *Liability of Chief Jerman and the City of Cedar Rapids*

Finally, the Court will address whether Chief Jerman and the City of Cedar Rapids may be held liable on plaintiff's federal claims. "[T]he inadequacy of police training may serve as the basis for [Section] 1983 liability only where the failure to train amounts to deliberate indifference to the rights of persons with whom the police come into contact." *City of Canton, Ohio v. Harris*, 489 U.S. 378, 388 (1989) (footnote omitted). "When the issue is qualified immunity from individual liability for failure to train or supervise, deliberate indifference is a subjective standard . . . [b]ut an objective standard of deliberate indifference applies to . . . failure-to-supervise claims against [a municipality]." *S.M. v. Lincoln Cnty.*, 874 F.3d 581, 585 (8th Cir. 2017) (citations and

internal quotation marks omitted). To establish municipal liability, "[t]here must at least be an affirmative link between the training inadequacies alleged, and the particular constitutional violation at issue." *City of Oklahoma City v. Tuttle*, 471 U.S. 808, 824 n.8 (1985).

In the absence of an actual constitutional violation, this case does not present facts that would support a finding of "deliberate indifference to the rights of persons with whom the police come into contact," regardless of whether deliberate indifference is viewed subjectively or objectively. *See Harris*, 489 U.S. at 388. The Court thus finds that Chief Jerman, in his individual capacity, is entitled to qualified immunity for the alleged failure to train and/or supervise Cedar Rapids Police Department personnel, and that the facts of this case are insufficient to support municipal liability against the City of Cedar Rapids for the same claims. The finding that the facts of this case cannot support municipal liability for failure to train and/or supervise extends to Chief Jerman in his official capacity as well because a suit against a state officer in his official capacity "is not a suit against the official, but rather is a suit against the official's office[, and] is no different from a suit against the State itself." *Hafer v. Melo*, 502 U.S. 21, 26 (1991) (citation and quotation marks omitted). Defendants' motion for summary judgment is **granted** as to plaintiff's failure to train and/or supervise claims.

Finally, the Court finds that because the stop itself and all subsequent events were lawful, plaintiff does not have standing to pursue any claims against Chief Jerman, in his individual or official capacities, or against the City of Cedar Rapids for the alleged creation and/or implementation of an unlawful policy, practice, or custom. *See Lyons*, 461 U.S. at 101-02. Because neither Officer Richardson nor Officer Jupin committed any unlawful acts, Chief Jerman did not "ratify" any unlawful actions by his alleged failure to adequately investigate the April 24, 2016 incident. (*See* Doc. 22, at 10; *see also* Doc. 49, at 21 (asserting Chief Jerman's "review[ ] of Captain Furnish's] internal

investigation" as the basis for Chief Jerman ratifying the officers' actions)). Chief Jerman, in his individual capacity, is therefore entitled to qualified immunity on plaintiff's claims that Chief Jerman violated plaintiff's rights by ratifying Officers Richardson's and Jupin's allegedly unlawful conduct. Similarly, because the evidence presented in this case does not show that Chief Jerman adopted and/or implemented an unlawful official policy, practice, or custom, Chief Jerman, in his individual capacity, is entitled to qualified immunity on those claims.

By reason of Chief Jerman's entitlement to qualified immunity, summary judgment is **granted** in favor of Chief Jerman, in his individual capacity, for plaintiff's claims based on a ratification theory, and for those claims asserting that Chief Jerman adopted and/or implemented an unlawful policy, practice, or custom.[8] The Court finds that the evidence does not support plaintiff's claims that Chief Jerman and the City of Cedar Rapids were deliberately indifferent to the rights of persons with whom police may come into contact, and that plaintiff lacks standing to pursue claims of creation and/or implementation of an unlawful policy, practice, or custom against Chief Jerman, in his individual and official capacities, and against the City of Cedar Rapids. The Court **grants** summary judgment in favor of Chief Jerman, in his individual and official capacities, and the City of Cedar Rapids for such claims. Plaintiff's claims of ratification must fail as a matter of law, and the Court thus **grants** summary judgment in favor of Chief Jerman, in his individual and official capacities, and in favor of the City of Cedar Rapids on plaintiff's claims that are based on a ratification theory.

---

[8] The Court notes that there are multiple bases for granting summary judgment in favor of Chief Jerman, in his individual capacity. Although the Court is under no obligation to address additional grounds for granting summary judgment in Chief Jerman's favor, in his individual capacity, the Court will do so in the following sentences, in the interest of being thorough.

### B. State Law Claims

Plaintiff's remaining two claims are brought under Iowa state law and assert claims of negligence and false arrest against Officers Richardson and Jupin, and claims against the City of Cedar Rapids based on a *respondeat superior* theory for the allegedly tortious acts of Officers Richardson and Jupin. (Doc. 22, at 12-13). Plaintiff does not provide a statutory basis for his claims. The Court finds that defendants are entitled to judgment as a matter of law on both claims.

#### 1. Negligence

It is not clear which acts, specifically, plaintiff's negligence claims are based upon, nor is it clear how Officers Richardson and Jupin allegedly breached a duty they owed to plaintiff. Plaintiff alleges only that Defendants Richardson and Jupin "owed a duty to [plaintiff] to exercise reasonable and due care when dealing with [plaintiff] as a member of the public and to take into consideration each of [plaintiff's] constitutional rights . . .." (*Id.*, at 12). Plaintiff does not reference any state constitutional rights, and the Court will therefore assume that the reference to "constitutional rights" in plaintiff's negligence claims refers to plaintiff's federal constitutional rights. Defendants argue that plaintiff's negligence claims fail to state claims upon which relief can be granted and that, even if the claims are valid, defendants are entitled to statutory immunity. (Doc. 40-1, at 29-34). Plaintiff does not refute the assertion that the claims fail to state claims upon which relief can be granted and, instead, refutes only defendants' statutory immunity argument. (Doc. 49, at 22-23). The Court's analysis as to the negligence claim is the same with respect to the individual defendants and to the City of Cedar Rapids.

Iowa does not recognize "an independent tort for negligent investigation of crime by law enforcement officers," regardless of whether the allegedly negligent investigation resulted in an arrest. *Hildenbrand v. Cox*, 369 N.W.2d 411, 415 (Iowa 1985). To the

extent plaintiff's negligence claims are premised on the officers' allegedly negligent investigation, defendants' motion for summary judgment is **granted**.

The Court also finds that plaintiff's negligence claims must fail if they rely upon a duty owed either to the public at large or to plaintiff, specifically. Iowa Supreme Court precedent "precludes liability to individuals based on breach of a duty the [S]tate owes to the public at large." *Estate of McFarlin v. State*, 881 N.W.2d 51, 58 (Iowa 2016). Liability can attach only if a plaintiff can establish a special relationship between the State and the plaintiff. *Id.* (citation omitted). Even if the officers did breach a duty owed to the public at large, that breach could not form the basis for liability to plaintiff. Plaintiff has not asserted that a special relationship existed between the State or the officers and plaintiff, and the Court therefore declines to find a duty existed based on a special relationship. To the extent plaintiff's negligence claims rest on a theory of a duty owed to either the public generally or to plaintiff, specially, defendants' motion for summary judgment is **granted**.

Finally, the Court has already found that plaintiff did not suffer a violation of any federal constitutional rights. As plaintiff's state common law negligence claims seem to rest on a theory that plaintiff's federal constitutional rights were violated, the Court finds that plaintiff's negligence claims fail. Defendants' motion for summary judgment is **granted** as to plaintiff's state law negligence claims.

### 2.    *False Arrest*

Plaintiff's final claim asserts that plaintiff was subjected to false arrest when he "was detained and handcuffed against his will . . . without justification or probable cause." (Doc. 22, at 13). The elements of a false arrest claim under Iowa law are 1) detention or restraint against one's will, and 2) unlawfulness of the detention or restraint. *Thomas v. Marion Cnty.*, 652 N.W.2d 183, 186 (Iowa 2002) (citations omitted). The Court will assume, for purposes of the current motion only, that plaintiff was detained or

restrained against his will, and the Court will proceed to the second element of plaintiff's false arrest claim.

Here, the Court has found above that the officers lawfully temporarily detained and restrained plaintiff based on reasonable suspicion to believe plaintiff was one of the males involved in criminal activity involving a firearm. After officers patted down plaintiff to check for concealed weapons and heard from a witness who indicated plaintiff was not one of the suspect males, the officers immediately released him. There was simply nothing unlawful about the detention in this case.

Alternatively, the officers had a valid basis for arresting plaintiff for interference with official acts. The Iowa Supreme Court has established the standard of probable cause that governs civil actions for false arrest:

> [T]o justify a warrantless arrest for a crime not committed in his presence, a police officer must allege and prove 1) that he in good faith believed that the person arrested had committed the crime, and 2) that his belief was reasonable. *Children v. Burton*, 331 N.W.2d 673, 680 (Iowa 1983). In considering these two matters, courts look to the facts within the officer's knowledge at the time the arrest was made. *Id.*

*Kraft v. City of Bettendorf*, 359 N.W.2d 466, 469 (Iowa 1984). "Probable cause . . . must be determined on the particular facts of each case. *Id.* at 470 (citing *Children*, 331 N.W.2d at 680).

Without recounting the full breadth of facts again, and without finding that plaintiff was in fact arrested, the Court finds that the officers did have probable cause under Iowa law to arrest plaintiff. Iowa Code Section 719.1(1)(a) makes it unlawful for a person to "knowingly resist[ ] or obstruct[ ] anyone known by the person to be a peace officer . . . in the performance of any act which is within the scope of the lawful duty or authority of that officer . . . ." A defendant need not use force to be guilty of interference with official acts. *State v. Sullivan*, No. 08-0541, 2009 WL 250287, at *2 (Iowa Ct. App. Feb. 4,

2009). As detailed above, neither plaintiff nor Bates stopped immediately upon commands to do so. Plaintiff does not claim that he failed to recognize that defendants Jupin and Richardson were law enforcement officers, and the Court finds that there is no real contention that the officers were unrecognizable as peace officers. Under the circumstances, the officers had probable cause to believe that plaintiff and Bates were interfering with official acts in violation of state law. (*See also* Doc. 47-1, at 48 (Officer Richardson's deposition, in which he stated that he believed he "had enough to charge" plaintiff with interference with official acts.)).

When plaintiff and Bates refused to stop when commanded to, it became "reasonably necessary" for the officers to use force to carry out their duties of investigating the potential concealed weapons charge. *See In re D.I.P.*, No. 00-0659, 2001 WL 293612, at *2 (Iowa Ct. App. Mar. 28, 2001) ("'Resist' has been interpreted to mean the 'person charged engaged in active opposition to the officer through the use of actual or constructive force making it reasonably necessary for the officer to use force to carry out his duty.'" (quoting *State v. Donner*, 243 N.W.2d 850, 854 (Iowa 1976))). The Court's finding that the officers' use of force was "reasonably necessary" is based, in part, on the officers' belief that the males could have been armed and the danger that could accompany an armed conflict. Regardless of whether plaintiff could be convicted of interference with official acts for refusing to stop when ordered to do so, the Court finds that the officers, at the very least, had probable cause to believe that plaintiff was committing or had committed the crime, and the officers, therefore, could lawfully arrest plaintiff.

Thus, the Court concludes that even if plaintiff was arrested, the arrest was lawful. Because plaintiff is unable to prove the second element of his false arrest claim, all defendants are entitled to judgment as a matter of law on the false arrest state law claim.

*Thomas*, 652 N.W.2d at 186.  Defendants' motion for summary judgment is **granted** as to plaintiff's false arrest claim.

## *IV.  CONCLUSION*

For the stated reasons, the Court finds that the defendants who were sued in their individual capacity and who were not dismissed are entitled to qualified immunity on plaintiff's Section 1983 claims, that the City of Cedar Rapids and Chief Jerman, in his official capacity, are entitled to judgment as a matter of law on the Section 1983 claims, and that all defendants who were not dismissed are entitled to judgment as a matter of law on plaintiff's state law claims.  When read together, the Court's findings amount to a complete grant of summary judgment as to the defendants who are not voluntarily dismissed.  Defendants' motion for summary judgment (Doc. 40) is, therefore, **granted** as to the defendants who are not dismissed by this Order, and **denied as moot** as to the defendants who are dismissed by this Order.  Plaintiff's motion for voluntary dismissal (Doc. 55) is **granted**.

**IT IS SO ORDERED** this 1st day of April, 2019.

_____
C.J. Williams
United States District Judge
Northern District of Iowa